Thank you, Your Honor, and may it please the Court, George Hicks for Petitioner Gilberto Torres Calvillo. I would like to reserve two minutes for rebuttal. The Board of Immigration Appeals committed three critical legal errors in affirming the immigration judge's decision to deny any relief to Mr. Torres. First, the board refused to even consider whether any of the articles and reports submitted by Mr. Torres, or any of the facts therein, were subject to administrative notice, bolstering his claim under the Convention Against Torture. Instead, they treated Mr. Torres' request for administrative notice as a request to reopen the record, which is a different procedure for a different purpose with a different standard not applicable here. Second — Scalia, but really didn't they — and I'm sorry to interrupt you — but didn't they really determine what he said was true and still rule? I mean, if these reports would have come in, it wouldn't have changed that they still suggested that what he had told them was true. Well, Judge Smith, I think that the — what the board did, actually, was to not even take consideration of what were the critical facts in that that led the immigration judge to deny relief in finding that the Knights Templar were not operating, and therefore, there was not a likelihood that it was the Knights Templar. Well, I understand how you may want to make a good argument, but the honest truth was they took what the BIA determined that what he said was true. In other words, his allegations, they said they were true, and then they still ruled against him. So I was trying to figure out what would be the difference if those new documents would have come in. Oh, I think the difference would have been that, first of all, they were showing that what he was threatened with was by a — by the Knights Templar cartel that, you know, was giving credibility to his assertions. And they took that as true? Well, I don't know if they took it as true, because I don't think they were giving any credence to the idea that it was the Knights Templar cartel backed with — by the acquiescence of public officials in the area. They were — the board was simply saying that there was — that there was not sufficient evidence. Well, really, it seems to me that what we're really talking about and that what the case really turns on is whether it's particularly dangerous crime. Well, I agree that that is another area. And after that, true or not true, if it's particularly dangerous crime, we're in — you're in trouble for your client. Well, I'm happy to talk about the particularly serious crime. Yeah, I'm sorry. Sorry. That is certainly another area. And I'm happy to talk about that first, because I think that is a very plain error by the immigration judge and the board. I think if you take a look at this Court's decision in the Miguel-Miguel case, where the Court applied the Montgomery Ward factors for retroactively applying an agency decision, I really do think it is really on all fours with the circumstances here. I mean, some of the factors that are looked at under Montgomery Ward are departure from previous practice, reliance on the previous regime. Well, let's look at Montgomery Ward factors. The first one is, is this case one of first impression? It probably is. Well, I think it's the exact same situation as in Miguel-Miguel. I think it would be probably a first impression. Does the rule depart from abruptly well — depart abruptly from well-established practice or merely fill a void? I don't think it represents an abrupt departure. Well, I — with all respect, I think this Court said otherwise in Miguel-Miguel, because at the time, the regime that was in place before this presumption was put in were the Frantescu factors, which was sort of a case-by-case individualized analysis that did not involve any presumption whatsoever. And so that was in place both when Mr. Miguel-Miguel's conviction occurred in 1999 and when Mr. Torres' conviction occurred in 1999. So I think that when you're talking about reliance interests in the sense of, you know, whether somebody at the time is going to plead guilty to a particular crime, I think this — I think it's — Well, there was, in fact, 74 pounds of marijuana for sale, right? That is what he pleaded guilty to, but I don't think that that has any applicability to the Montgomery Ward retroactivity factors. Well, I understand. All I'm trying to say is there's an application, if you will, by the IJ as to how he would come out in this particular situation using the Frantescu factors, if you will. Then I guess I'm trying to figure out, if I go to the Montgomery Ward factors, why it is so impermissibly retroactive, because it seems to me that's the question. I said, I'm not sure that it isn't one of first impression, which would be something which we might have here. Doesn't depart really — I didn't think abrupt departure, so I'm glad to hear you. Your client had no lawful status, right? At the time, I don't believe so. Therefore, he had no expectation, as did Miguel Miguel. Oh, I think he — no, I think at the time — I mean, Miguel Miguel was not — he had lawful status at the time. Right, but I don't think that — I don't read anything in Miguel Miguel to turn on that. What it turned on was the reliance interest of pleading guilty. Well, I'm just going through the extent to which the party relied on former law. I mean, he had no lawful status, so I'm trying to figure out why he had an expectation that he was authorized to be here or that he would have an opportunity to apply for asylum. He had no lawful status. Well, the expectation under the — under the reliance factor of Montgomery Ward is not about lawful status. It's about, you know, what is going to determine your particularly serious crime. And at the time, in 1999, that was determined by the case-by-case individualized Frantescu factors. So to back up a little bit, neither the immigration judge nor the board — the board in a very passing sentence — looked at this from the Frantescu factors. They started with the retroactivity analysis. Well, I understand, but — And I — and I don't hear the government, in fact, to be arguing that there's any distinction between Miguel Miguel in this case except for the difference in weight of the drugs, although it's a different drug. So I don't know how — you know, I think it cuts both ways. But I think the important point is that that difference in, you know, the type of drug or the weight really did not factor into Miguel Miguel's retroactivity analysis. If you — if you, frankly — the extent to which the party relied on the former law, it doesn't seem to me that your client had any realistic reason to rely on the former law because he had no — he had no lawful status. Well, I think — He had no expectation that he was authorized to be here. Well, with all respect — He had no — he had no — he had no reason to think he'd have an opportunity to apply for asylum. But — Quite different than Miguel Miguel. Sure. With all respect, Judge Smith, the expectation is not with respect to what's happening right then. It's if he knew that in the future that he would be, you know, very likely to be subjected to torture and try to come to the United States and make that claim and learn at that point that, oh, by the way, your conviction 10 years ago, we're now going to, you know, apply a completely different standard that was not the case at the time, that's the — that's the reliance interest. That's the expectation in the Shane's law. All right. Let's turn to — let's turn to factor four, degree of burden, which the retroactive order would impose on him. He isn't being — your client is not being deported. He's only requesting withholding of removal. Well, I — with all respect, I think that, you know, the difference between withholding of removal and not having that is still a significant degree of burden. I — Well, I appreciate your argument, but I'm trying to suggest whether that is the degree of burden which I should suggest is the high degree that needs to be under the factors. And I said to myself, and I appreciate that I'm being a devil's advocate and putting you to the test, but the petitioner's not being deported. He's requesting withholding of removal. If he — he'd be deported otherwise, and there's no substantial evidence that he'd be prosecuted. Well, I — again, I think the difference between withholding and not withholding is still a pretty significant degree. It may be somewhat lesser than deported or not deported, but, you know, it's not nothing. And I think that, again, I don't read Miguel Miguel or I don't read the government arguing that Miguel Miguel turned on any sort of difference like that. Well, I'm just going through the Montgomery Ward factors which you say apply. And I think they apply to Miguel Miguel, and I think that they bind this Court as well. If I could reserve my time. Thank you. May it please the Court. Christopher Buchanan for the United States Government. Your Honor, just to take up where you left off with opposing counsel, the government just point out that the Ward factors — the first factor is considered neutral when it comes in the immigration context because the government's application of its own rules is at play. And again, under Garfias-Rodriguez, the second and the third factors are very closely intertwined. And in this case, Miguel Miguel could not be more inapposite, not only because of the factual disparity — 74 pounds pushed across an international border for the purposes of which is Torres-Calvillo's conviction — just could not be more different than purchasing 0.26 grams of cocaine for $20 from an undercover cop in the United States. However, there is another difference, and that is for retroactivity purposes that was present in Miguel Miguel but is not present here, and that is that Miguel Miguel was initially found by the judge not to have committed a particularly serious crime. And during the process of remand back and forth from the board, a matter of why all came out. And thereafter, the immigration judge found that the very same conviction now was a particularly serious crime. And so you had in Miguel Miguel the agency making two opposing pronouncements about whether a conviction qualified as a particularly serious crime. And in this case, that is not in play. As the board made clear — this is the record at 4 footnote 3 — the board made clear that even under an application of Montgomery Ward, Torres-Calvillo's conviction would still be considered a particularly serious crime because of the sheer volume of the drugs that he pushed across the border. So the — all that to say is that whether you go with the matter of why all presumption, his conviction firmly qualifies as a particularly serious crime, and there's no dispute — there's no dispute before this Court about the effect of the application of a matter of why all to the conviction in his case. So if we — if we permit the analysis under a matter of why all, then we end up at a particularly serious crime. If, on the other hand, we permit an analysis under a matter of Frantescu, as the board hinted in that footnote, the weight accorded by the agency to the sheer quantity of illegal drugs transported for sale in this case outweighed all of the other factors, which the agency was more than aware of because the board affirmed the immigration judge's matter of why all analysis in toto, without exception and without caveat. And that's playing from the first paragraph, Limericker to 4, where the board begins to pick out and highlight portions of the immigration judge's decision, but then concludes, we affirm what? We affirm that decision in its entirety. All it says is that we affirm, which is — stands in marked contrast to the board's analysis of the immigration judge's convention against torture, where the board is far more selective and it approves — it affirms a finding of fact, the immigration judge's finding of fact about the — Torres' failure to establish the requisite probability of torture, but then stops there, and then thereafter, there is no further torture analysis. As I understand it, the I.J. was really applying the A.G.'s, if you will, idea of what drug trafficking crimes are particularly serious crimes. The I.J. was really applying the six factors the A.G. had outlined in determining, in general, what drug trafficking crimes were particularly serious? That's correct, Your Honor. And then after he got it, then the B.I.A. got it, right? Yes, Your Honor. The B.I.A. affirmed that analysis in its entirety. That's what I understood. And as I understood it, the B.I.A. further said, it's not impermissibly retroactive because even without the factors, the amount of the marijuana was enough for the — to meet the criteria. That's correct, Your Honor. It would have been the same result. So really, we're talking about the ward factors as to whether it's impermissibly retroactive because if it's not impermissibly retroactive, then at that point, the I.J. is correct, right? That's correct, Your Honor. And that's why we have to take up the factors. However, the factors, in the government's view, if the court undertakes its own analysis of the ward factors, which it certainly is permitted to do under Garfias-Rodriguez, we still end up at the same conclusion. And that is because the first factor is neutral in the immigration context. The second and third factors are closely intertwined, but the board's determination that the sheer weight of marijuana, 74 pounds in this case, was such that his conviction would have qualified as a particularly serious crime, regardless of the matter of why, regardless of any retroactivity. And so — and it is that determination that lands squarely on the second and third ward factors, which are so closely intertwined, as the Garfias-Rodriguez court outlines for us. If he cannot — if those factors don't favor him, then he cannot prevail on a retroactivity analysis challenge under ward. So the first factor is neutral. The second and third factors he loses because, unlike Miguel Miguel, he was a drug courier pushing 74 pounds of marijuana across international border. And unlike Miguel Miguel, he has no detrimental reliance because at no point was that conviction ever going to qualify as a particularly serious crime, the board tells us. In addition to the — to what Your Honor pointed out, that he had no reliance interest on being in the United States, as opposed to Miguel Miguel, who had been granted asylum at the time of his conviction. Well, all I was trying to do is go through here and try to determine what these factors would be. And since I have a de novo determination to make, I was trying to make those determinations. So let's move to the second. Is there really substantial evidence to support the determination that he failed to establish clear probability of torture? Yes, Your Honor. So there's — there are two sort of piles of evidence here. The first is what was actually considered by the immigration judge. And then the second is what was introduced for the first time on appeal, but citing or laying claim to the administrative notice provision and thus in running the requirements for a motion to reopen, which by regulation govern the submission of new evidence. So as to that first portion of evidence that was submitted by the immigration judge and considered by the immigration judge, there was this disconnect between his testimony, which depended entirely on the identity of the Knights Templar. That identification was established by Torres Cabello. That was something that he hung his claim on, but his background evidence didn't support that. Well, it seemed to me that for cat relief, the petitioner had to show more likely than not that he would be tortured in the future. Yes, Your Honor. Not — nothing to do with the past, though the past might give some indication of the future. That's true. And also that the state action would be involved in the torture. That's true. He has both. He has to put both up. Right? That's true, Your Honor. And it seemed to me the IJ says, we'll give you the total idea that you're credible and that you've experienced fear in the past. We don't have anything here about torture. And they also said there's nothing in this record that the Mexican government would support the chief of police. In fact, we don't think the Mexican government would support the chief of police, who might suggest that you ought to be tortured by these gangs. So then I thought the BIA said there's no evidence the petitioner would face a probability of torture. More likely than not, he would be tortured. And I frankly didn't see the petitioner challenge that finding. That's right, Your Honor. The petitioner has waived any challenge to the immigration — to the, really, the board's qualified affirmance of the immigration judge's determination about torture. The petitioner's arguments before this Court have depended entirely, exclusively perhaps, on the submission of new evidence for the first time on appeal that was rejected, as the board is required to do under the motion to reopen regulations and this Court's precedent in the Ayatollah Berria case. Then why would we even need to go to the second prong if he's not likely to be tortured at all? So, Your Honor, I agree. I think that the board — the board's determination — the board's affirmance of the immigration judge's torture analysis reflects that the board affirmed but then stopped at the determination that Torres Calvillo failed to establish the requisite probability of future torture. Without the requisite probability of future torture, any further analysis about government acquiescence or not of the Mexican government is irrelevant. And it makes — this case kind of brings that point home. Your Honor, that concludes my presentation subject to your questions. Thank you. Thank you. Thank you, Your Honor. Just a few points. On the particularly serious crime point, I do want to go back to Miguel Miguel and just note that on several of the factors, for example, the third factor, it's really talked — this is the reliance that you're saying that alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions. So when Miguel pled guilty in 1999, he had a realistic chance that the board, applying Frantescu, would find that the crime was not particularly serious. And so — and the circumstances changed, says the application of Y.L. changes the game entirely. So I think that's the reliance interest we're talking about under Miguel Miguel. And then going to the fourth factor again, we have previously held that deportation alone is a substantial burden that weighs against retroactive application. I grant you we're not talking about deportation here, but the difference between withholding and not withholding. But Miguel Miguel goes on to say, here the burden is much greater. Miguel testified his life would be threatened if he returned to his home country. So again, I think — We have no evidence of that in this record. Well, we're — on this point, I'm focusing on the particularly serious crime and taking that as a given. But — I understand. But I'm just trying to suggest the degree of burden which the retroactive order would impose. And he was not being deported. He was going for withholding of removal. And I think it's of some added consequence that there's no substantial evidence in this record he'd be persecuted. Well, I think that this goes back to the first issue on the administrative notice. And I think it is undisputed that none of the tribunals below the board even considered whether this should be administratively noticed. It wasn't this sort of binary choice that the government likes to say that the board was put to. You know, the choice that they had was whether to administratively notice these facts that are in these reports, just like this Court allowed in the Oye v. Gonzales case, which I think is the most on-point decision that the government really doesn't have any response to other than to say it's unpublished. And by all means, you know, if you want to make this an unpublished decision that follows Oye, that would be perfectly fine. But I think that it shows that the same administratively noticed countrywide facts that go towards demonstrating persecution and torture when you go back are the same here. I don't know if you have any further questions. Thank you. Thank you for your help, Counsel. The Court appreciates the argument. And the case of Calvillo, Torres-Calvillo v. Sessions, is submitted.
judges: Bea, N.R. Smith, Lasnik